# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1443

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas |
| J. Fred Hart, Jr., | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted:   December 16, 1999

Filed:   May 1, 2000

_____

Before McMILLIAN and MURPHY, Circuit Judges, and TUNHEIM,[1]
    District Judge.

_____

McMILLIAN, Circuit Judge.

J. Fred Hart, Jr. appeals from a final judgment entered in the United States District Court[2] for the Eastern District of Arkansas upon a jury verdict finding him guilty on two misdemeanor counts under 18 U.S.C. § 248, the Freedom of Access to

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable John F. Forster, Jr., United States Magistrate Judge for the Eastern District of Arkansas.

Clinic Entrances Act ("FACE Act"). See United States v. Hart, No. 4:98CR00132-001 (E.D. Ark. Feb. 11, 1999) (judgment). For reversal, Hart argues that the district court erred in denying his motion for judgment of acquittal on the grounds that (1) a Ryder truck does not in and of itself constitute a threat of force under the FACE Act, (2) his conduct was specifically protected by the First Amendment, and (3) the FACE Act is an improper expansion of federal jurisdiction in violation of the Commerce Clause. For the reasons stated below, we affirm.

## Jurisdiction

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231. Jurisdiction is proper in this court based upon 28 U.S.C. §1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

## Background

Hart is an attorney who practices in Little Rock, Arkansas. He is also a self-declared anti-abortion activist who regularly engages in peaceful protests outside abortion clinics. On September 24, 1997, he rented two Ryder trucks in Little Rock, under his own name. On September 25, 1997, the same trucks were found in the driveways of two Little Rock abortion clinics, the Women's Community Health Center and the Little Rock Family Planning Services ("the clinics"). The placement of the trucks at the clinics coincided with a visit from President Clinton to a Little Rock high school. Each truck was unattended and carried no indication as to its purpose for being there. Each truck was parked in the entrance driveway rather than an ordinary parking area.

On the morning of September 25, 1997, employees arriving at the clinics were alarmed by the presence of the trucks. Reminded of the catastrophic 1995 bombing of a federal office building in Oklahoma City, Oklahoma, involving a Ryder truck,

employees of the clinics feared that the trucks contained bombs. They immediately left the buildings and notified the police. At each clinic, the area was evacuated, and a bomb squad was called in to investigate. The authorities determined, however, that the trucks contained no explosive materials.

The rental and placement of the Ryder trucks was tracked to Hart. A grand jury subsequently indicted him on two counts of violating the FACE Act.[3] Hart filed a motion to dismiss his indictment, arguing that the mere parking of the trucks could not support a finding of actual intimidation and challenging the constitutionality of the FACE Act. The district court denied his motion. Hart then pleaded not guilty to both counts.

At trial, the government presented the testimony of several witnesses, including employees from both clinics and neighboring establishments, all of whom feared that the Ryder trucks contained bombs, given the way in which they had been parked at the clinics. Several police officers also testified that they believed the trucks presented "a high threat level" and thus evacuated the area surrounding each clinic. In addition, the government presented a stipulation of expected testimony from Hart's father. Hart's

---

[3]Count I of the indictment alleged that, on or about September 25, 1997, Hart

> did by threat of force, intentionally intimidate and interfere, and attempt to intimidate and interfere, with persons because they were obtaining reproductive health services, and with persons because they were providing reproductive health services, and in order to intimidate any persons from obtaining and providing reproductive health services, by parking a Ryder truck in the parking area at the Little Rock Family Planning Services.

Count II alleged the same with respect to the Women's Community Health Center.

father believed that Hart parked the Ryder trucks in the clinic driveways knowing that they would "cause some turmoil."  Based on conversations with his son, Hart's father concluded that Hart acted with the intent that "if people believed that there was a bomb on one or more of those Ryder trucks, that it would have been worth it in order to save at least the life of one baby."

Hart presented the testimony of Carrie Land, a Special Agent for the FBI. Through her testimony, Hart established that, shortly after his indictment, he observed four Ryder trucks parked outside the offices of the FBI in Little Rock.  Hart notified Ms. Land that Ryder trucks were parked outside her building, but she did not respond with alarm.  In fact, she testified that she did not investigate the trucks until prompted by Hart's visit to the office, even though she had previously seen the trucks.  She stated that she dismissed the presence of the Ryder trucks because she knew that other occupants of the building were in the process of moving.

At the close of the government's case, Hart filed a motion for judgment of acquittal, again arguing that the government's case charged nothing more than the parking of a Ryder truck at each clinic, which, according to Hart, could not form the basis for a conviction.  The district court denied the motion.  On November 2, 1998, the jury returned a verdict of guilty on both counts.  Hart was sentenced to four years of probation, the first twelve months of which to be served in home detention, 200 hours of community service, and a special assessment of $50.00.  Hart timely appealed.

**Standard of Review**

In reviewing a denial of a motion for judgment of acquittal for insufficiency of the evidence, we draw all reasonable inferences in favor of the government.  To prevail, Hart must show that the evidence presented by the government was not sufficient to permit a reasonable jury to find him guilty beyond a reasonable doubt.  See United

-4-

States v. James, 172 F.3d 588, 591 (8th Cir. 1999); United States v. Vig, 167 F.3d 443, 445 (8th Cir.), cert. denied, 120 S. Ct. 146 (1999).

**Discussion**

Congress enacted the FACE Act in 1994 in an effort to combat the continuing violence against, and forcible interference with, abortion clinics, those providing or receiving abortion-related services, and their families. See H.R. REP. NO. 103-306, at 5-7 (1993), *reprinted in* 1994 U.S.C.C.A.N. 699, 701-03. To this end, the FACE Act provides criminal and civil penalties against anyone who:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

18 U.S.C. § 248(a)(1).

In United States v. Dinwiddie, 76 F.3d 913 (8th Cir.), cert. denied, 519 U.S. 1043 (1996), this circuit interpreted the "threat of force" language of the FACE Act. This court instructed that, because the First Amendment forbids the government from prohibiting speech that is merely forceful or aggressive, conduct constitutes a "threat of force" in violation of the FACE Act only if it constitutes a "true threat." Id. at 925 (citing Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam)); see also United States v. Brock, 863 F. Supp. 851, 858 n.7 (E.D. Wis. 1994), *aff'd sub nom.* United States v. Soderna, 82 F.3d 1370 (7th Cir.), cert. denied, 519 U.S. 1006 (1996). To determine whether a true threat exists, a court must analyze the alleged threat in light of its "entire factual context" and determine "whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently

or in the future." <u>United States v. Dinwiddie</u>, 76 F.3d at 925 (internal quotations omitted). This court also identified several factors to be taken into consideration when making this determination: how the recipient and other listeners reacted to the alleged threat, whether the threat was conditional, whether it was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. <u>See</u> <u>id.</u>

The defendant in <u>United States v. Dinwiddie</u>, who for many years had protested outside the Planned Parenthood of Greater Kansas City ("Planned Parenthood") clinic, was convicted under the FACE Act for "obstructing, using physical force against, and threatening to use physical force against a number of Planned Parenthood's patients and members of its staff." <u>Id.</u> at 917. Specifically, the defendant, on more than fifty occasions, threatened a clinic doctor, often through a bullhorn, by stating, "[r]emember Doctor Gunn [a physician who was killed by an opponent of abortion] . . . . This could happen to you. . . . He is not in the world anymore. . . . Whoever sheds man's blood, by man his blood shall be shed." <u>Id.</u> In response to these statements, the doctor began wearing a bullet-proof vest to the clinic. This court held that the defendant's conduct violated the statute. This court reasoned that, although the defendant did not specifically threaten to injure the doctor, the manner and context in which the statements were made and the reaction they elicited supported the conclusion that the statements constituted "threats of force" which were intended to intimidate, and did intimidate, the doctor. <u>See</u> <u>id.</u> at 925-26.

Hart argues that he did not violate the FACE Act because merely parking a Ryder truck at the entrance of an abortion clinic cannot in and of itself constitute a "threat of force." Specifically, he argues that, because the trucks themselves were not inherently dangerous and they were unaccompanied by threats of death or physical injury, their placement cannot serve as the basis for a conviction under the statute. Hart explains that Ryder trucks are commonplace vehicles rarely associated with danger or intimidation and that clinic staff and the police deemed the trucks threatening only

because they were reminded of the Ryder truck involved in the Oklahoma City bombing. However, according to Hart, individual cultural inferences and speculation regarding the meaning of the placement of the Ryder trucks and their association with the Oklahoma City bombing do not suffice to render the trucks a "threat of force" under the FACE Act. See Brief of Appellant for 15. As further support for his argument, Hart points to the incident that occurred after his indictment, in which he notified FBI personnel that Ryder trucks were parked outside their headquarters, yet, they did not react with alarm. Hart contends that his conviction was based upon the jury's speculation as to the meaning of the trucks, which is not a valid basis for a criminal conviction. See id. at 17. We disagree.

Consistent with our decision in United States v. Dinwiddie, our inquiry focuses on whether the jury reasonably could have believed that parking the Ryder trucks in the clinic driveways, in light of the surrounding circumstances, constituted a "true threat" of force. Given the context and manner in which Hart placed the Ryder trucks and the reaction of clinic staff and patients and others, we conclude that it was reasonable for the jury to find that Hart's conduct constituted a "true threat" of force.

First, Hart targeted abortion clinics, which are often sites of protests and violence. In particular, Hart regularly protested outside the two clinics at which he parked the Ryder trucks. He also placed the trucks in the driveways, near the entrances, rather than in the parking lot. The trucks actually blocked the entrance to each clinic building. In fact, an employee at one clinic testified that the truck had been parked "as close to [the clinic] as it could possibly be." Furthermore, the placement of the trucks at the clinics coincided with a visit to Little Rock from President Clinton, whose presence in the area further heightened concerns about potential violence. It was reasonable for the jury to conclude that Hart, by placing a Ryder truck directly in the entranceway of each clinic, sought to take advantage of the heightened level of security concerns in the Little Rock area to create a threat of violence on that particular day. Moreover, Hart offered no legitimate reason for leaving the trucks early that morning, and he provided no notice or explanation for his actions. These

circumstances, coupled with the similarity to the well-known events of the Oklahoma City bombing, were reasonably interpreted by clinic staff and police officers as a threat to injure. Furthermore, the reaction of clinic staff indicates that they did in fact perceive the Ryder trucks as a threat of force. Several clinic employees testified that they believed that the trucks contained bombs, and they immediately contacted the police, who evacuated the clinics and nearby homes and businesses and called in bomb squads.

Moreover, the jury's finding is not inconsistent with the fact that the Ryder trucks at the Little Rock FBI offices did not raise similar fears. That situation illustrates that it was not the Ryder trucks themselves that presented the threat at the clinics, but rather, it was the manner in which they were parked and the absence of any legitimate reason for their presence. Unlike the staff at the clinics, the FBI agents had no reason to fear the trucks parked outside their offices because those trucks were parked in the parking lot, not blocking an entranceway, and a legitimate explanation for their presence existed in that it was known that other occupants of the building were moving. In addition, the government presented the stipulated testimony of Hart's father, who believed that Hart sought, by his actions, to frighten clinic patients and staff and thereby actually interfere with the provision of abortion services. In sum, we hold that the district court did not err in denying Hart's motion for judgment of acquittal on the basis of insufficiency of the evidence.

In the alternative, Hart argues that the FACE Act is vague and overbroad as applied to him because it does not put ordinary persons on notice that inherently non-threatening conduct could subject them to criminal prosecution. These arguments were rejected in United States v. Dinwiddie, 76 F.3d at 924, and fail here, as well. As previously discussed, Hart's conviction is not based on the mere presence of a Ryder truck at each clinic. Rather, his conduct violated the statute because of the particular manner and context in which he parked the trucks. See United States v. Lee, 6 F.3d 1297, 1304 (8th Cir. 1993) (recognizing that an act of expression can constitute a threat

if "intended to threaten acts of violence . . . or intended to cause [individuals] . . . to reasonably fear the use of imminent force or violence"). Hart reasonably knew that he was creating the impression that bombs might detonate at the clinics.

Hart's remaining arguments present facial challenges to the constitutionality of the FACE Act. First, Hart claims that his indictment violated the Free Speech Clause of the First Amendment. Briefly, Hart argues that, because the FACE Act targets anti-abortion activists, it imposes an impermissible burden on the exercise of speech based on its content. Hart asserts, in the alternative, that even if the FACE ACT does not attach a content-based restriction on speech, the placement of the Ryder trucks at the entrance of each abortion clinic constituted expressive conduct, which is protected by the First Amendment, even where it is intimidating. See Brief for Appellant at 19 (citing NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982) (protecting political expression, even where it has the effect of intimidation); Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105 (1991) (protecting offensive or emotionally unsettling speech)). We disagree.

In United States v. Dinwiddie, 76 F.3d 923, this court held that the FACE Act does not impose content-based restrictions on speech; rather, it prohibits the obstruction of reproductive health services without regard to the issue motivating the speech. That the FACE Act disproportionately impacts anti-abortion protestors does not transform its prohibitions into content-based restrictions. Id.; see also United States v. Weslin, 156 F.3d 292, 297 (2d Cir. 1998) (per curiam), cert. denied, 525 U.S. 1071 (1999). Furthermore, although the FACE Act prohibits "threats of force," to which an expressive element may attach and warrant some First Amendment protection, the government may limit such expression subject to intermediate scrutiny. See United States v. Dinwiddie, 76 F.3d at 923-24. With respect to the FACE Act, this court has already held that the government has a significant interest in protecting those seeking reproductive health services and in ensuring the availability of reproductive health services, and that the government's interest is not related to restricting free speech. See

id. at 924. The FACE Act is narrowly tailored because it imposes criminal liability for only three types of activities: uses of force, threats of force, and physical obstructions. The FACE Act survives Hart's First Amendment challenge.

Finally, Hart argues that his conviction should be vacated because Congress exceeded its authority under the Commerce Clause in passing the FACE Act. However, as Hart concedes, this court upheld the FACE Act as a valid exercise of Congressional power to regulate interstate commerce. See id. at 920 (holding that the conduct prohibited by the FACE Act substantially affected interstate commerce). Thus, Hart's Commerce Clause challenge is without merit.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.